UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Marcus Trice (1),<br><br>    Defendant. | Case No. 22-cv-243 (MJD/DTS)<br><br>**REPORT & RECOMMENDATION** |

Defendant Marcus Trice moved to suppress evidence found in his luggage during a search incident to arrest. Dkt. No. 29. He argues the underlying arrest was unlawful for lack of probable cause, and that therefore any search incident to that arrest was likewise unlawful. Because there was ample probable cause to support Trice's arrest, the Court recommends his motion to suppress be denied.[1]

**FACTS**

On August 31, 2022, Bloomington Police responded to a 911 call from the Sheraton Hotel on 78th Street West, reporting what hotel employees believed to be a fraudulent hotel booking. Tr. of Mot. Hrg. (Tr.) at 12:15-13:6. Officer Kevin Truong responded to the call. His body worn camera from that incident was admitted into evidence as Government's Exhibit 1. When Truong arrived, hotel staff informed him that a guest checked into the hotel using the hotel's mobile check in system but that the owner of the credit card used to book the room, Ryan Machado, sent a message to the Sheraton

---

[1] Trice also moved to suppress statements [Dkt. No. 28] but has since withdrawn that motion. Tr. of Mot. Hrg. at 7:3-8, Dkt. No. 64 The Court therefore recommends the motion be denied as withdrawn.

1

through their online system saying he had not made a reservation. Gov. Ex. 1 at 1:03:20.[2] Machado had already cancelled that credit card in response to the reservation charge. *Id.* at 1:04:11. Another person in the Sheraton chat claimed to be the card owner's son and asked that his dad keep the reservation because it was for a friend. Though Machado's name was on the reservation, a second name appeared as well—Shayvon Jackson.

Trice was in the hotel lobby during this time, a few feet away from Ofc. Truong. 1:04:45; Tr. at 19:7-13. Trice told Truong that his cousin Achille had booked the room but Trice could not spell his cousin's name or provide his last name. Gov. Ex. 1 at 1:04:56-1:05:12. Trice told Truong he was in town for a funeral, that his cousin booked the room, and that his cousin's friend had provided Trice the room number. *Id.* at 1:05:20-41. Trice did not know where the funeral was taking place and noted this was his first time in the area. When asked who the funeral was for, he responded it was for his cousin's friend. Around this time, backup police officers arrived on the scene. Throughout this encounter, Trice's responses to officers' questions were often significantly delayed. He frequently muttered and his responses were garbled.

Truong asked to see Trice's ID. He also asked to see the credit cards Trice was holding. *Id.* at 1:07:10. Trice stated he did not know the reservation was fraudulently booked. He explained his cousin booked the room but again could not provide his cousin's last name. *Id.* at 1:07:20-:30. He stated he had just arrived at the airport around 11:00pm[3] from Seattle. Truong asked Trice for his cousin's phone number or anything showing that

---

[2] All time stamps reflect the times shown on the bodycam footage, which also aligned with the time of day.
[3] Trice appears to have landed at the Minneapolis-St. Paul airport at 11:00pm on August 30, 2022, then made his way to the hotel. The events leading up to Trice's arrest all occurred in the very early morning hours of August 31, 2022.

the cousin had booked the room. Trice searched through his phone and showed Truong text messages. *Id.* at 1:08:?? The texts included instructions to go to the Sheraton, but not booking information or confirmation information. Tr. at 34:3-6. Truong asked Trice if he knew Shayvon Jackson; he responded that he did not know him. Gov. Ex. 1 at 1:10:20-30. When asked why he would try to check into a room with a stranger's name on it, Trice said his cousin had booked him the room. *Id.*

During this exchange, Trice's cell phone rang several times. While Truong was reviewing the text messages Trice had shown him, Trice received a call from AK. Trice stated AK was a friend who was helping him get into the hotel since Trice was from out of town and was unfamiliar with the area. It was also AK who had texted Trice the hotel information. When Truong asked about the discrepancy between AK sending hotel information and Trice's earlier statements that his cousin had booked him the room, Trice's explanation was largely garbled. Gov. Ex. 1 at 1:10:30-1:11:35. He never asserted that AK was his cousin, and instead referred to AK only as a friend. *Id.*

Officer Alex Blaine also spoke with Trice during this incident. His bodycam was admitted into evidence as Government's Exhibit 2. He asked Trice when he was going to be leaving the Twin Cities. Trice was not sure how long he was going to stay; he said he thought he would stay a day or two. Blaine asked about Trice's return airline ticket to Seattle. Trice explained he was not sure whether he had a return ticket; he stated his cousin had bought him the tickets. Gov. Ex. 2 at 1:11:38-1:12:10. Blaine asked to see Trice's flight confirmations and Trice gave him his boarding pass and receipt from his flight from Seattle to Minneapolis. He did not have a receipt for a return ticket. *Id.* at 1:12:10-1:13:00. Blaine asked Trice if he had ever been arrested before. He answered

he had been arrested in Washington for domestic violence. Blaine asked if Trice had ever been arrested for any drug offenses. Trice responded "not really." *Id.* at 1:12:00-1:14:18. In response to whether he had left anything in the hotel room, Trice responded there was some beer. *Id.* at 1:14:25-46.

Blaine next asked whether Trice had used drugs that day. Trice acknowledged he had smoked marijuana prior to leaving Seattle. Blaine also asked whether Trice had any illegal drugs in his suitcase or in the hotel room. Trice responded that he did not. Blaine asked for consent to search Trice's suitcase; Trice declined to consent. *Id.* at 1:15:00-30. Around this time in the incident, Truong learned from the police dispatch team that Trice had a prior drug offense on his record. Tr. at 42:7-12, Dkt. No. 64. Trice agreed to go to the hotel room with Officers Blaine, Truong, and one other officer. Gov. Ex. 2 at 1:15:40-1:16:10.

Once in the room, officers looked around the room[4] and Blaine again asked for consent to search Trice's bag. Trice denied consent. Blaine then asked who booked the room and Trice stated his cousin set it up, but he did not know who really booked it. *Id.* at 1:20:50-1:21:22. He explained that before he left, he was not sure whether his credit card would work so he asked his cousin to help him to set up a room for him. *Id.* at 1:21:40-1:21:50. Based on the numerous phone calls he was receiving, officers then asked if Trice was supposed to meet up with someone. Trice said no and stated that he had called his friend to tell him about the problem with the hotel. Blaine again asked whether Trice had ever been arrested for a drug crime. Trice said he had not. Blaine then explained why the

---

[4] The hotel had asked the police to evict Trice from the hotel room, and the officers were ensuring no personal property remained in the room. *See* Tr. at 45:4-8, Dkt. No. 64.

4

circumstances looked suspicious, including that someone else booked the room and travel; Trice could not name the person whose funeral he was supposed to attend, etc. *Id.* at 1:22:00-1:22:59.

Blaine received information from a dispatch officer that Trice may have provided a false name to officers. Based on that information, Blaine handcuffed Trice. *Id.* at 1:25:30-41. Truong asked whether Trice had ever given police a fake name. Gov. Ex. 1 at 1:25:52. Trice stated he wished to exercise his right to remain silent. *Id.* at 1:25:58. Blaine asked for Trice's Social Security Number, which he provided; Blaine called a dispatch officer to cross-check Trice's criminal history. Gov. Ex. 2 at 1:27:35-1:28. Meanwhile, Troung told Trice he was being detained because police believed he had given them a false name and because the owner of the credit card had not authorized the reservation and Trice had tried to check into the room. Gov. Ex. 1 at 1:28:07-25. Trice told Truong he had not used anyone else's card and had not checked into the room; instead his cousin's friend brought him the key. He did not know the name of the person who brought him the key. *Id.* at 1:28:25-1:28-49. Trice then asked why the police thought his ID was fake. Truong told him that when they ran his name, it returned a known alias. Trice then stated that he had legally changed his name from Frederick Floyd (the known alias) to Marcus Trice in 2005. *Id.* at 1:29:37-44.

Blaine explained that he was arresting Trice based on suspected credit card fraud. He explained that even though he had not used the credit card himself, he was an accomplice. He also explained the fact that he had given two names and the officers were unable to confirm his identity raised suspicion as well. Gov. Ex. 2 at 1:34:34-1:35:39.

5

Officers then searched Trice's belongings, including a large black suitcase he had kept with him throughout the incident. In lifting the suitcase from the floor to the bed, Truong and Blaine each noted that it was very heavy. *Id.* at 1:36:45-50. At the bottom of the suitcase inside of rolled up clothing, were several large pill bottles. *Id.* at 1:37:50. The bottles appeared to be factory sealed but were much heavier and denser than one would expect. Tr. at 106:2-6, Dkt. No. 64. Blaine cut open one of the bottles and found M-30 pills, which are known to contain Fentanyl. Gov. Ex. 2 at 1:39:56. During the search, hotel security knocked on the door; Truong spoke with a hotel security officer who told him that Shayvon Jackson was on the phone with hotel staff and was looking for Trice. Gov. Ex. 1 at 1:40:13-1:41:43.

Trice moved to suppress the evidence found in his luggage. He argues the search was unlawful because it was conducted incident to his arrest, which was itself unlawful. The Government argues there was ample probable cause for Trice's arrest and that the search of his luggage was a lawful search incident to arrest.

## ANALYSIS

Though he moves to suppress evidence borne of an allegedly illegal search, Trice's motion turns on whether his arrest was lawful. Because the search of his luggage was conducted incident to his arrest, if his arrest was unlawful, the exclusionary rule would require suppression of evidence found during that search, he argues. Def. Mem. at 9, Dkt. No. 62 (citing *Mapp v. Ohio*, 367 U.S. 643, 656 (1961). The Fourth Amendment prohibits "unreasonable searches and seizures," and provides that law enforcement may only obtain a warrant "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const.,

6

amend. IV. A warrantless arrest is only consistent with the Fourth Amendment if it is supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Probable cause is a "practical, nontechnical" concept, which turns on "the factual and practical considerations of everyday life on which a reasonable and prudent [person], not legal technicians, act." *Id.* (citing *Illinois v. Gates*, 462, U.S. 213, 231 (1983)). This determination is fluid and turns on the totality of the circumstances. *Id.* at 371; *United States v. Chauncey*, 420 F.3d 864, 870 (8th Cir. 2005). When there is "reasonable ground for belief of guilt" which is "particularized with respect to the person," there is probable cause to arrest. *Chauncey*, 420 F.3d at 870. "A probability or substantial chance of criminal activity, rather than an actual showing of criminal activity is sufficient" to support probable cause. *United States v. Smith*, 715 F.3d 1110, 1115 (8th Cir. 2013) (quoting *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008)). This is not a "high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). "Suspicious behavior," including "nervous, evasive behavior is a pertinent factor" in assessing probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (assessing reasonable suspicion); *District of Columb. v. Wesby*, 138 S.Ct. 577, 587-88 (2018) (applying *Wardlow* to probable cause); *see also Jones*, 535 U.S. at 891.

Trice argues his arrest was unlawful because there was no probable cause to believe he had committed or was committing financial transaction card fraud under Minnesota law. He quotes the applicable statute in full in support of this argument. Def. Mem. at 8, Dkt. No. 62. While he acknowledges that he had a key to the fraudulently-booked room, he also points out that there was "little—if any—evidence to support the conclusion that Trice was responsible for using Mr. Machado's financial information to

book the hotel room." Def. Mem. at 8, Dkt. No. 62. Police did not then know who had booked the room. *Id.* Trice also relies on the fact that he "was never in possession of a credit card or form of identity that did not belong to him," nor did he use or attempt to use credit card information that was not his own. *Id.* at 8-9. Trice's argument essentially contends he was swept up in someone else's fraud and that his presence at the hotel was innocuous.

But Trice ignores or downplays important circumstances that could have led a reasonable person to suspect criminal activity. Trice had a key to the fraudulently booked hotel room and he was present at that hotel late at night. That alone raises suspicion that he was involved in the fraudulent booking. *See United States v. Dawdy*, 46 F.3d 1427, 1429 ("Factors that may reasonably lead an experienced officer to investigate include time of day or night, location or suspect parties, and the parties' behavior when they become aware of the officer's presence."). The fact that authorities did not know who had fraudulently used Machado's information, far from exonerating Trice, potentially implicates him because he was the person now accessing that fraudulently booked room. In addition, Trice's story about how he got access to the hotel room was questionable: he claimed his cousin had booked the room but that another person provided him with the key. Trice claimed not to know the name of the person from whom he had received the hotel room key, nor could he provide his own cousin's last name. These circumstances all add suspicion about Trice's involvement with booking the hotel room. *See Jones*, 535 F.3d at 891. Though officers may not have had proof to establish every element of the Minnesota financial card transaction statute as Trice implicitly argues, a probable cause

determination does not require law enforcement to "conduct a mini-trial before making an arrest." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999).

Furthermore, Trice's answers to officers' questions were frequently nonresponsive; he often stuttered and delayed answering with extended verbal tics like "ums" and "uhs." When he did respond to questions, his answers were often bizarre. For example, he did not know his own cousin's last name; he could not spell that cousin's first name. He also purported to have traveled from Seattle to the Twin Cities to attend a funeral for a person he could not name, a story which belies reason. There were also inconsistencies in Trice's story. For example, he claimed repeatedly that his cousin had helped him get the room, yet he showed Officer Truong text messages about the room which were sent by someone named "AK" and averred that AK was his friend, not his cousin. Trice had no real explanation for how all the players fit together in his story.

Moreover, police learned Trice had a known alias, which Trice acknowledged, raising questions about his identity. The confusion about the names of the people in Trice's story—Trice's cousin, the cousin's friend, Trice himself—raise suspicion of credit card fraud under Minnesota law, which necessarily includes some deceit about the identity of the cardholder. *See e.g.*, Minn. Stat. § 609.821 Subd. 8. Regardless, Trice's strange answers and inconsistencies at least suggest evasive behavior which could raise suspicion that Trice was involved in credit card fraud or other similar criminal activity and raise doubt about his story's veracity. *Wesby*, 138 S.Ct. at 587-88 ("Peaches' lying and evasive behavior gave the officers reason to discredit everything she told them."); *see also Walz v. Randall*, 2 F.4th 1091, 1102 (8th Cir. 2021) ("[I]nconsistent stories can support probable cause."). Officer Truong also noted that Trice was sweating, appeared

nervous, and his hands were trembling at times, circumstances which also bear on a probable cause determination. Tr. at 40:22-41:4, Dkt. No. 64; *Wesby*, 138 S.Ct. at 587-88. Considering the totality of the circumstances, probable cause supported Trice's arrest and it was therefore lawful. *See Pringle*, 540 U.S. at 370.

Because Trice's arrest was lawful, an exception to the Fourth Amendment's warrant requirement applies to the search of his luggage. Searches incident to lawful arrests are excepted from the warrant requirement and allow search of "the arrestee's person and the area within his immediate control," which includes "the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (citing *Chimel v. Calif.*, 395 U.S. 752, 763 (1969). Because the arrest was lawful, the exclusionary rule does not apply to the search and the Court recommends Trice's Motion to Suppress be denied.[5]

---

[5] Notably, Trice has not argued the search of his luggage was unlawful even in the event of a lawful arrest. Though Court therefore declines to address such an argument in detail, it is worth noting that because the suitcase appears to have been in Trice's control throughout the incident (it was standing next to him in the lobby and he wheeled it through the hallways and into the hotel room), the luggage search would fall under the scope of a search incident to a lawful arrest. *See Chimel v. Calif.*, 395 U.S. 752, 763 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. . . And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule….There is ample justification, therefore, for a search of the arrestee's person and the area within his immediate control."); *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010) (collecting cases where a suitcase or bag was considered in the defendant's immediate control even while the defendant was restrained).

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1. Trice's Motion to Suppress Statements [Dkt. No. 28] was withdrawn and should therefore be **DENIED**.

2. Trice's Motion to Suppress Evidence from Warrantless Search [Dkt. No. 29] be **DENIED**.

Dated: August 17, 2023                                 s/David T. Schultz
                                                                  DAVID T. SCHULTZ
                                                                  United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).